IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DEKALB COUNTY BOARD OF REGISTRATION AND ELECTIONS; et al.,<br><br>Defendants. | Civil Action No.<br>1:20-cv-00879-ELR |

**PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO DISMISS**

**INTRODUCTION**

Defendants' Motion to Dismiss (Dkt. 27) is based on a fundamental misunderstanding of Georgia law and a disregard for the Supremacy Clause of the U.S. Constitution. Their argument that state law requires boards of elections to immediately purge voters based on an alleged change of address is incorrect. Even if it were correct, Defendants ignore that their purge practices violate the express language of the NVRA prohibiting such removals, as well as the holdings of every court to rule on the subject.

Moreover, Defendants' characterizations of their policies are inconsistent with one another. Defendants assert they have a policy of immediately purging successfully challenged voters to comply with state law. However, they also suggest that Plaintiffs have failed to challenge a DeKalb Board of Registration and Elections ("BRE") "policy or custom" under 42 U.S.C. § 1983. Defendants cannot have it both ways. In any event, Plaintiffs have more than adequately pled a § 1983 claim under the applicable Supreme Court and Eleventh Circuit standard.

Defendants' jurisdictional arguments are similarly infirm. Their suggestion that Plaintiffs lack standing ignores the Complaint's allegations that the Georgia NAACP and Georgia Coalition for the Peoples' Agenda have conducted voter registration and other outreach efforts in DeKalb County to combat the purging of

eligible voters, that their members have sustained injury, and that the interests Plaintiffs seek to protect are germane to the organizations' goals. And their argument that Plaintiffs' claims against the DeKalb BRE and its individual members are barred by the Eleventh Amendment are unfounded.

Finally, Defendants make the novel and unsupported assertion that voters who lack a permanent fixed address do not have a constitutional right to register to vote. This dangerous argument is legally flawed and risks disenfranchising DeKalb County's most vulnerable voters in the midst of the COVID-19 pandemic. For these reasons, Defendants' motion to dismiss should be denied in its entirety.

## ARGUMENT

Plaintiffs submit this Memorandum of Law in opposition to the Motion to Dismiss filed by Defendants DeKalb County BRE, its individual members in their official capacities, and Erica Hamilton in her official capacity as the Director of Voter Registration and Elections. *See* Dkt. 27. Defendants' Motion must be denied because: (1) Plaintiffs have organizational and associational standing to assert their claims; (2) the Eleventh Amendment does not bar Plaintiffs' NVRA or constitutional claims; (3) Plaintiffs have pled facts that, if proved, establish a violation of the NVRA and the U.S. Constitution; (4) Plaintiffs seek valid and enforceable injunctive relief; and (5) the Complaint states a proper claim for §

1983 liability. In ruling on this Motion, the court must accept the facts alleged in the Complaint as true and construe them in the light most favorable to the Plaintiffs. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012). A complaint must state a plausible claim for relief to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## I. PLAINTIFFS HAVE STANDING

Defendants' contention that the Georgia NAACP and the Georgia Coalition for the People's Agenda ("GCPA") lack standing, *see* Dkt. 27 at 12-16, is factually and legally flawed. In cases like this one where a defendant makes a facial attack on subject matter jurisdiction under Federal Rule 12(b)(1) and submits no evidence outside the pleadings, the Court looks to whether the plaintiff has "sufficiently alleged a basis of subject matter jurisdiction, and the allegations in the complaint are taken as true for the purposes of the motion." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). "Where only injunctive relief is sought, only one plaintiff with standing is required." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018) (citing *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007)). Here, however, both Plaintiffs have alleged facts sufficient to confer standing and therefore subject matter jurisdiction.

To have standing, Plaintiffs must (1) have suffered an injury that is concrete, particularized, actual, and imminent; (2) show a causal connection between the injury and the challenged action; and (3) demonstrate that a favorable judgment will redress the injury. *See* Dkt. 27 at 12-13; *see also Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (internal citations omitted). Defendants challenge Plaintiffs' standing on the injury-in-fact and causation prongs, but not the redressability prong. *See* Doc. 27 at 13-16.

### A. Plaintiffs Have Suffered an Injury in Fact

To establish injury in fact, "[a]n organization may demonstrate a concrete, imminent injury either through a 'diversion-of-resources' theory or through an 'associational-standing' theory." *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1336 (N.D. Ga. 2018) (citing *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014)). The Georgia NAACP and the GCPA have standing under both theories. Moreover, because injunctive relief is prospective in nature, an organization need only show that its members "face[] a probability of harm in the near and definite future." *Browning*, 522 F.3d at 1160-61.

#### *1. Direct Organizational Standing*

Defendants' argument that Plaintiffs lack organizational standing, *see* Doc.

27 at 13-14, conflicts with all of the relevant case law in the Eleventh Circuit and in this Court. Under the "diversion of resources" theory, "an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019) (citing *Arcia*, 772 F.3d at 1341). Organizations engaged in voter registration and get out the vote activities have standing when a defendant impairs those activities, forcing them to divert time, money and staff to assist voters. *See, e.g.*, *Arcia*, 772 F.3d at 1341-42; *see also Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350-51 (11th Cir. 2009); *Browning*, 522 F.3d at 1165-66; *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1258 (N.D. Ga. 2018).

The Georgia NAACP and the GCPA, the Plaintiffs here, are both "dedicated to increasing voter participation through advocacy and election procedures." *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration and Elecs*, --- F. Supp. 3d ----, 2020 WL 1031897, at *3 (N.D. Ga. Mar. 3, 2020). They aver that "Defendants' purges are causing [them] to divert a portion of its financial and other organizational resources to educate voters about Defendants' purges and assisting potential voters who have been purged from the rolls." Doc. 1 ¶¶ 10-11. Educating and assisting DeKalb County voters imposes costs on the organizations,

each of whom "has and will have fewer resources to dedicate to its other organizational activities unless Defendants are enjoined from continuing to illegally purge voters." *Id.*

This type of drain on Plaintiffs' resources is sufficient to confer standing. *See, e.g.*, *Browning*, 522 F.3d at 1165 (holding "an organization suffers an injury in fact when a statute compels it to divert more resources to accomplishing its goals… the fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury" (citing *Crawford*, 472 F.3d at 951); *Fair Fight Action*, 413 F. Supp. 3d at 1267 (holding diverting "resources from general voting initiatives or other missions… to programs designed to address the impact of the specific conduct" is sufficient); *Martin*, 341 F. Supp. 3d at 1334 (holding that "Defendants cite to no authority that an organizational plaintiff *must* explain exactly how its resources will be diverted from one endeavor to another before sufficient injury can be drawn").[1]

[1] *Jacobson v. Fla. Sec'y of State*, --- F.3d ----, 2020 WL 2049076 (11th Cir. Apr. 29, 2020), does not disturb the settled precedent supporting Plaintiffs' standing in this case. *See id.* at *8 (citing *Browning*, 522 F.3d at 1165 & n.14; *Billups*, 554 F.3d at 1350). *Jacobson* merely restates the commonsense requirement that, to claim diversion of resources, organizations must identify from where they are diverting resources. *Id.* at *9. Whereas the organizations' evidence in *Jacobson* was weak on that score, *see id.*, Plaintiffs here detail voter registration and get out the vote work impacted by Defendants' conduct. *See* Doc. 1 ¶¶ 10-11.

The cases cited by Defendants such as *Georgia Shift v. Gwinnett Cty.*, 2020 WL 864938 (N.D. Ga. Feb. 12, 2020), and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), are inapposite. In both cases, no harm had occurred at the time the lawsuit was filed. *See Georgia Shift*, 2020 WL 864938, at *3-4 (plaintiffs' 2019 complaint alleged various problems might occur in the 2020 elections); *Clapper*, 568 U.S. at 410 (holding plaintiffs' alleged injury in fact "rests on their highly speculative fear" that a chain of events would result in their communications being intercepted). By contrast, the DeKalb BRE's 2019 purges have already taken place and are presently affecting voters' eligibility to vote in 2020 elections; thus, Plaintiffs have already had to divert its resources to educated voters who may have been purged about the need to re-register. All the while, Defendants' purge policies remain in force. *See* Doc. 27 at 3 (noting "[f]rom time to time, the BRE holds hearings on challenges to voter registrations within the County"). These circumstances are very different from *Clapper*, where, for standing to exist, the Government would have to first (1) target non-U.S. persons' communications; (2) invoke authority under a particular statute; (3) prevail with the FISA Court; (4) intercept plaintiffs' contacts' communications; and (5) plaintiffs would be parties to the particular communications intercepted. *See Clapper*, 568 U.S. at 410.

***2. Associational Standing***

The Georgia NAACP and the Gwinnett County NAACP also have associational standing, despite Defendants' arguments to the contrary, *see* Doc. 27 at 15. An organizational plaintiff has associational standing "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). An organization needs to establish only "that at least one member faces a realistic danger of [injury]." *Browning*, 522 F.3d at 1163. This is particularly true for organizations with high membership rates. *See Arcia*, 772 F.3d at 1342 (citing *Browning*, 522 F.3d at 1163).

Here, the Georgia NAACP has approximately 10,000 members and the GCPA has more than 5,000 members, many of whom are DeKalb County registered voters who intend to vote in future elections and are at risk of being harmed if the BRE's purge practices are permitted to continue. *See* Doc. 1 ¶¶ 10-11. These allegations, which must be accepted as true, satisfy the low threshold set forth in *Arcia* and *Browning* since it sufficient to allege "that at least one of their members will face a realistic probability of harm in the near and definite future."

*Gwinnett County NAACP*, 2020 WL 1031897, at *4; *see also Curling v. Kemp*, 334 F. Supp. 3d 1303, 1316 (N.D. Ga. 2018) (rejecting defendants' argument that plaintiffs' allegations were "only a speculative, generalized fear, thus falling short of establishing a concrete injury" and finding plaintiffs sufficiently "allege the threat of future harm"); *Crittenden*, 347 F. Supp. 3d at 1336.

The remaining requirements for associational standing are also satisfied here. *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Protecting the right to vote is germane to the purpose of Plaintiff organizations, which are advocacy groups geared towards increasing voter education and turnout. *Compare* Doc. 1 ¶¶ 10-11, *with Gwinnett County NAACP*, 2020 WL 1031897, at *4. When injunctive relief is sought is sought, "individual participation of the organization's members is not normally necessary. The nub is whether the members themselves would have standing." *Crittenden*, 347 F. Supp. 3d at 1336 (citing *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008)). That is certainly true here, where Plaintiffs' members are at risk of disenfranchisement due to Defendants' purge policies.

### B. <u>Plaintiffs' Injury Was Caused by Defendants' Conduct</u>

Defendants' claim that Plaintiffs cannot show that Defendants caused their injuries, *see* Doc. 27 at 16, is likewise without merit. The "causation" prong of the

standing analysis is satisfied when Plaintiffs "are able to demonstrate a time period in which the injury will occur." *Fair Fight Action*, 413 F. Supp. 3d at 1268. Here, the injury is ongoing because purged former DeKalb County voters are at risk of not being able to vote in future elections, forcing Plaintiff organizations to respond appropriately. *See id*. (observing "[t]here is no speculation that elections will occur; thus, this satisfies the 'imminent' requirement"). Moreover, "Plaintiffs allege Defendants will continue to engage in this behavior, causing Plaintiffs to divert resources to address these issues in the next election cycle." *Id*. at 1268.

Defendants cannot avoid culpability by pinning the blame on the General Assembly or other state actors. *See* Doc. 27 at 16. Contrary to their suggestion, state law does not "mandate[]" that the DeKalb BRE immediately purge voters who are challenged on the basis that they have moved. *See* O.C.G.A. §§ 21-2-228, 21-2-229. State law merely provides for the bare notice- and hearing-related requirements in the event that a voter's eligibility is challenged. *See id.*

Defendants here "misread and oversimplify *Clapper*[]" to support their claim that Plaintiffs' injuries are not sufficiently traceable to their conduct. *See Fair Fight*, 413 F. Supp. 3d at 1268. Defendants' argument fails because the Complaint alleges that the DeKalb BRE's purges of voters "have, and will, result in injury to the Plaintiffs." *Id*. The fact that Defendants have already removed

numerous voters from the rolls and that Plaintiff organizations have already been burdened is an important factor in the causation prong being satisfied here. *See Arcia*, 772 F.3d at 1342 n.2 (distinguishing *Clapper* because harm had already occurred); *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1315 (N.D. Ga. 2018) (reasoning that fear of harm was not unfounded because harm already occurred).

## II. PLAINTIFFS' CLAIMS ARE NOT BARRED BY ELEVENTH AMENDMENT OR LEGISLATIVE IMMUNITY

### A. The DeKalb County BRE Is Not an Arm of the State

Defendants' argument that Plaintiffs' claims against the BRE are barred by the Eleventh Amendment because the BRE is "an arm of the state," *see* Dkt. 27 at 8, is mistaken. According to the Eleventh Circuit, "states are extended immunity, counties and similar municipal corporations are not, and entities that share characteristics of both require a case-by-case analysis." *U.S. ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 601 (11th Cir. 2014). The inquiry is not a broad-based, generalized inquiry; courts "must focus on the particular function at issue" in the suit. *Manders v. Lee*, 338 F.3d 1304, 1319 (11th Cir. 2003). Thus, the question is whether an entity acts for the state "in a particular area, or on a particular issue." *Stanley v. Israel*, 843 F.3d 920, 924 (11th Cir. 2016).

In Eleventh Amendment cases, the Eleventh Circuit uses four factors to determine whether an entity is an "arm of the State" in carrying out a particular

function: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders*, 338 F.3d at 1309. Each of these factors supports the conclusion that the BRE is not an arm of the state. *See Lightfoot v. Henry Cty. Sch. Dist.*, 771 F.3d 764, 770-72 (holding that Eleventh Amendment immunity does not apply and "it is not sufficient that the School District's powers and duties are derived from state law").

According to Georgia law, each board of elections, while "created" by the General Assembly, is created and empowered exclusively with respect to a single county, here DeKalb County. O.C.G.A. § 21-2-40(b). Such board, acting as the "superintendent," may perform duties only within a particular county. *Id*. § 21-2-70; *see Lightfoot*, 771 F.3d at 769-70 (observing that "Georgia's Constitution often groups school districts together with counties and municipalities… distinct from the State"); *Cash v. Granville Cty. Bd. of Education*, 242 F.3d 219, 226 (4th Cir. 2001) (fact that school board's jurisdiction limited to one county supports conclusion it is not an arm of the state). Here, under state law, the DeKalb BRE is responsible for determining the eligibility of voters to register and vote in DeKalb County alone. O.C.G.A. §§ 21-2-217(b), 21-2-226(a) ("It shall be the duty of the county board of registrars to determine the eligibility of each person applying to

register to vote in such county"). Like school districts, "Georgia's Code likewise groups" county boards of elections "together with other political subdivisions." *See Lightfoot*, 771 F.3d at 770.

Moreover, the BRE and its employees are responsible for overseeing and adjudicating the voter challenge statutes that are at the core of the dispute in this case. *Compare id.* §§ 21-2-228, 21-2-229 (mandating "the registrars shall set a hearing on such challenge" and "the registrars shall determine said challenge and shall notify the parties of their decision"), *with McAdams v. Jefferson Cty. 911 Emergency Commc'ns Dist., Inc.*, 931 F.3d 1132, 1135 (11th Cir. 2019) (emergency communications district not "arm of the state" because Alabama Code bestowed the powers onto the county). Finally, under Georgia law, board members are chosen locally; they are not chosen or removed by state actors. *Compare id*. § 21-2-31 (setting forth the duties of the State Election Board), *with McAdams*, 931 F.3d at 1135 (district not "arm of the state" where "personnel decisions [were] made by local boards of commissioners, which are in turn appointed by counties and municipalities"); *Cash*, 242 F.3d at 225-226 (noting that board members were selected locally, not by the state). And Georgia law requires that each board (again acting as superintendent) submit its budget estimates to the county, not the State. O.C.G.A. § 21-2-70(12).

Perhaps most importantly, Georgia law places *all* of the financial burden of county boards of registration and elections, such as the BRE here, on the county, not the State. O.C.G.A. § 21-2-71. That includes the costs of paying employees and poll workers; paying for polling places; purchasing or printing ballots and other election supplies, including electronic voting equipment, and maintaining all such equipment. *Id*.; *see also Baxter v. Fulton-DeKalb Hosp. Auth.*, 764 F. Supp. 1510, 1522 (N.D. Ga. 1991) (holding that hospital authority was not an arm of the state and that its funding came from the county government, not the state); *McAdams*, 931 F.3d at 1135 (similar). The county is further responsible for "[a]ll other expenses arising out of the performance of [the board's] duties under this chapter." O.C.G.A. § 21-2-71(5). That undoubtedly would include payment of any judgments that might be entered arising out of such performance. *See Regents of the Univ. of California v. Doe*, 519 U.S. 425, 430 (1997) ("[W]hether a money judgment against a state instrumentality official would be enforceable against the State is of considerable importance."); *Cash*, 242 F.3d at 223 ("The principal factor, upon which courts have virtually always relied, is whether a judgment against the governmental entity would have to be paid from the State's treasury."); *McAdams*, 931 F.3d at 1136 (observing "it does not appear that Alabama would be financially responsible for a judgment against Jefferson County").

Defendants' sole source of authority on this subject is dictum from an unpublished opinion issued by another judge of this Court. *See Casey v. Clayton Cty., Ga.*, 2007 WL 788943 (N.D. Ga. Mar. 14, 2007). The *Casey* court denied the defendants' motion for summary judgment on immunity grounds and noted it was reserving its decision on whether the Clayton County Board of Elections was an arm of the state until trial. *Id*. at *9. The court also noted that "source-of-funds and responsibility-for-judgment factors appear to militate against Eleventh Amendment immunity." *Id*. at *9 n. 5. In any event, Plaintiffs respectfully submit that much of the court's analysis in this dictum in *Casey* was mistaken.

When all of the factors prescribed for consideration by the Eleventh Circuit are considered, it is clear that the BRE is not an arm of the state and therefore is not entitled to Eleventh Amendment immunity.

**B. Plaintiffs Seek Prospective, Not Retrospective Relief**

As Defendants concede, Plaintiffs may proceed against the individual defendants in seeking prospective injunctive relief. *See* Dkt. 27 at 11 (citing *Ex Parte Young*, 209 U.S. 123, 159-60 (1908)); *see also Curling v. Sec'y of State*, 761 F. App'x 927, 930-31 (11th Cir. Feb. 8, 2019) (holding plaintiffs "comfortably satisfy" the *Ex Parte Young* standard of an ongoing violation of federal law that seeks injunctive or declaratory relief, or both, against state officials).

Defendants contend that three aspects of the relief sought by Plaintiffs constitute impermissible "retrospective injunctive relief." Dkt. 27 at 11. Each of the three aspects of relief Defendants cite, however, are prospective. Ordering Defendants to preserve documents relevant to Plaintiffs' claims and to restore unlawfully purged voters to the rolls are unquestionably prospective. *See* Dkt. 1 at 30-31. This Court certainly has the authority under the Federal Rules of Civil Procedure to order Defendants to preserve, going *forward*, relevant documents. And ordering the restoration of unlawfully purged voters is functionally identical to ordering that 'Defendants not prevent from voting, in any *future* election, any voter whose name was unlawfully removed from the voter registration list.' This relief permits illegally purged voters to participate in future elections. Similarly, notifying voters whose provisional ballots have been rejected due to Defendants' purge practices is plainly prospective relief intended to prevent future voter confusion and disenfranchisement. By contrast, Plaintiffs are not seeking to change any election results after the fact, or asking for rejected votes to be counted.

**C. Defendants Are Not Entitled to Legislative Immunity**

The individual Defendants contend that they are protected from Plaintiffs' claims by legislative immunity because they arise out of Defendants' actions "when *implementing* the voter qualification procedure under state law." Dkt. 27 at

12 (emphasis added). Notably, Defendants do not argue, as they could not, that Plaintiffs' claims arise out of any *formulation* or *adoption* of those procedures.

Neither of the two cases to which Defendants cite indicate that legislative immunity applies here. In *Bogan v. Scott-Harris*, 523 U.S. 44 (1998), the Court applied legislative immunity to a city council member's "acts of voting for an ordinance" and the mayor's "introduction of a budget [to the city council] and signing into law an ordinance …." *Id*. at 55. In *Bryant v. Jones*, 575 F.3d 1281 (11th Cir. 2009), the court applied it to an employee who worked on a budget adopted by the DeKalb Board of Commissioners that eliminated a public position. *Id*. at 1306-07 (holding that "[u]nlike employee personnel decisions, the elimination of a public employment position does constitute a legislative act").

Those decisions are consistent with the rule that, "[g]enerally, absolute [legislative] immunity applies to 'prospective, legislative-type rules' that have general application." *Bryant*, 575 F.3d at 1306; *see also Woods v. Gamel*, 132 F.3d 1417, 1420 (11th Cir. 1998) (holding "[a]n act is deemed legislative, rather than administrative or managerial, when it is policymaking and of general application"). Holding "[a] legislative act involves policy-making rather than mere administrative application of existing policies," the Eleventh Circuit has observed:

> If the facts utilized in making a decision are specific, rather than general, in nature, then the decision is more likely administrative.

> Moreover, if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature.

*Crymes v. DeKalb County, Ga.*, 923 F.2d 1482, 1485 (11th Cir. 1991). Here, Defendants aver that they are not challenging "a local policy or custom." Dkt. 27 at 23. Moreover, the DeKalb BRE is not a legislative body and Defendants are not legislators.[2] Plaintiffs challenge Defendants' decisions to purge particular voters from the rolls. Each of those decisions was specific, not general, in nature; and they impact specific individuals—particular voters—not the general population. Defendants are therefore not entitled to legislative immunity.

## III. THE BRE's PURGES EXPRESSLY VIOLATE THE NVRA

The requirements of Section 8(d) are mandatory, straightforward, and unequivocal, as the Seventh Circuit and other courts have recognized:

> [Section 8(d)] forbids a state from removing a voter from that state's registration list unless: (1) it hears directly from the voter via a "request" or a "confirm[ation] in writing" that the voter is ineligible or does not wish to be registered; or (2) the state goes through the statutorily prescribed process

[2] This feature — that the action taken by the members of the DeKalb BRE was not policy-making — also distinguishes the DeKalb BRE members' action from that in *Ellis v. Coffee County Bd. of Registrars*, 981 F.2d 1185 (11th Cir. 1993), which held that members of the Coffee County Commission, a legislative body, could not be sued individually for damages relating to the Commission's investigation into the county's voting district lines, which impacted electors' eligibility. *Id*. at 1190-91 The court concluded that the Commission's investigation "to clarify any ambiguities concerning the boundaries" of the county constituted policy-making. *Id*. *Ellis* is not only distinguishable from this case but it is not in line with all other U.S. Supreme Court and Eleventh Circuit precedent on the issue.

> of (a) notifying the voter, (b) giving the voter an opportunity to respond, and (c) then waiting two inactive election cycles before removing a suspected ineligible voter who never responds to the notice. Both of these avenues focus on direct contact with the voter. The accuracy or lack thereof of the state's information concerning the voter's change in residence makes no difference under the NVRA. The statute does not set an accuracy threshold; it relies instead on follow-up with the individual voter.

*Common Cause Indiana v. Lawson*, 937 F.3d 944, 959 (7th Cir. 2019); *see also U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 381 (6th Cir. 2008) (holding that "States may not remove 'registrants' from an official list of eligible voters based on a change in residence unless . . . the specified criteria of [Section 8(d)] are met"); *Common Cause New York v. Brehm*, --- F. Supp. 3d ----, 2020 WL 122589, at *29 (S.D.N.Y. Jan. 10, 2020) (holding the same).

Courts have relied on Section 8 to strike down a number of list maintenance procedures that, regardless of their merits, removed voters who allegedly changed addresses from the list of eligible voters without complying with the mandatory notice-and-waiting-period requirement. *See*, *e.g.*, *Lawson*, 937 F.3d at 959-62 (affirming preliminary injunction because statute "allows Indiana election officials to remove a person from the rolls based on Crosscheck *without direct notification of any kind*"); *Land*, 546 F.3d at 386, 389 (denying stay of preliminary injunction of statute that required cancelling new voters' registration if voter ID cards mailed to them were returned back as undeliverable); *Brehm*, 2020 WL 122589, at *29

(New York cannot remove voters who have been sent confirmation notices from the rolls "until they fail to vote in two consecutive federal general election").

Section 8 applies to purges initiated by voter challenges. Before the 2016 general election, four individuals in a North Carolina county challenged 138 registered voters "on the grounds that the challenged voters were not residents of the precinct and/or municipality." *N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections and Ethics Enf't*, 2018 WL 3748172, at *4 (M.D.N.C. Aug. 7, 2018). Voters made similar challenges to registered voters' eligibility on residency grounds in Cumberland and Moore Counties. *Id*. at *8-9. The court held that those county boards "violated § 20507(d) of the NVRA in sustaining challenges to voter registrations based on change of residence … without complying with the prior notice and waiting period requirement in § 20507(d)." *See, e.g., id.* at *4.

In a recent Georgia case, Hancock County election officials entered into a consent decree subjecting the county to outside monitoring after organizations contested a series of voter 'challenge proceedings' conducted by the board in 2015. *Ga. State Conf. of the NAACP v. Hancock Cty. Bd. of Elecs. and Registration*, No. 5:15-cv-414, Doc. 67-1 at 2-3 (M.D. Ga. Mar. 1, 2017) ("[A]fter assessing the application of the NVRA and its provisions concerning change of residency, and recognizing the supremacy of federal law… Plaintiffs and Defendants have

concluded that this lawsuit should be settled in accordance with this Decree.”).

Here, the Complaint repeatedly alleges that Defendants’ purges were decided on the basis that voters allegedly moved from their address of registration. Doc. 1 ¶¶ 32 (Defendants purged a voter because he allegedly “has not lived at the address since 2015” and a letter addressed to him “was returned undeliverable”), 33 (alleging other voters were purged because an unnamed third party sent a letter to the DeKalb BRE stating that they “no longer lived at the address” and a “letter addressed to each individual was returned undeliverable”), 34, 37, 40-43, 64-65.

Defendants rely on *Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004). *See* Dkt. 27 at 18-19. However, *Marinko* is inapposite for the same reasons noted by the district court in *N.C. State Conf. of NAACP*. *See* 2018 WL 3748172, at *5 (noting *Marinko* is distinguishable “on several grounds” including it “raised a question that could not be answered with reference to the plain language of the NVRA”). In *Marinko*, the removed voters should never have been registered to vote in the first place and therefore were not protected by the NVRA. *Bell v. Marinko*, 235 F. Supp. 2d 772, 776-77 (N.D. Ohio 2002) (“[t]his is not a case in which the challenge arose because the challengers believed that the plaintiffs had moved, thereby rendering themselves ineligible to remain registered. Thus, the issues of change of residence, and the [NVRA] provisions applicable thereto, need not be

addressed”), *aff’d*, 367 F.3d 588 (6th Cir. 2004). The Sixth Circuit confirmed that the voters at issue “*were improperly registered in the first place*, and as a result, the voting rolls were inaccurate” (emphasis added). *Marinko*, 367 F.3d at 592; *see also Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1277-78 (D. Colo. 2010) (under the NVRA, “[t]he first prerequisite for removal clearly presumes that the affected voter ‘is registered’ at an address within the registrar’s jurisdiction and has moved ‘to a place outside the registrar’s jurisdiction’”).

Defendants’ citations to *Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019), *see* Dkt. 27 at 7-8, 17, 20, are similarly irrelevant. If anything, *Bellitto* counsels that, to comply with the NVRA’s list maintenance requirements, officials need only satisfy certain minimal requirements and need not undertake extraordinary measures. *See id*. at 1205 (noting that, in *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833 (2018), the Supreme Court “never suggested that the NCOA Process standing alone would not satisfy (a)(4), only that states may go beyond it”).

## IV. HOMELESS VOTERS AND OTHERS REGISTERING AT TEMPORARY ADDRESSES HAVE THE RIGHT TO VOTE

Defendants’ argument that there is no “right to use a temporary address to vote,” *see* Dkt. 27 at 20, is as legally infirm as it is unfortunate. Federal and state courts have routinely held that requirements are unconstitutional when they define “residence” narrowly to exclude homeless shelters or other temporary domiciles.

*See, e.g.*, *Pitts v. Black*, 608 F. Supp. 696, 710 (S.D.N.Y. 1984) (holding defendants' application of election laws "in violation of the equal protection clause of the Fourteenth Amendment" and "permanently enjoining defendants from refusing to allow homeless individuals to register to vote on the ground that they fail to inhabit traditional residences"); *Coal. for the Homeless v. Jensen*, 590 N.Y.S.2d 502, 503 (N.Y. App. Div. 1992) (recognizing homeless residents' right to vote); *Fischer v. Stout*, 741 P.2d 217, 221 (Alaska 1987) (voter may provide "a hotel, shelter for the homeless, or even a park bench" as a residence); *Collier v. Menzel*, 176 Cal. App. 3d 24, 36 (Cal. Ct. App. 1985) (homeless voters can use address of Fig Tree Park for voting purposes); *see also Cook v. Bd. of Registrars of Randolph Cty.*, 320 Ga. App. 447, 450, 453 (2013) (finding that domicile does not change "[i]f a person leaves the place of his domicile temporarily… and does not take up an actual residence elsewhere with the avowed intention of making a change in his domicile") (quoting *Haggard v. Graham*, 142 Ga. App. 498, 501 (1977)). The court's rationale in *Pitts* is particularly apt here:

> Homeless individuals identifying a specific location within a political community which they consider their "home base", to which they return regularly, manifest an intent to remain for the present, and a place from which they can receive messages and be contacted, satisfy the more stringent domicile standard and should not be disenfranchised solely because they lack a non-traditional residence.

608 F. Supp. at 710. Here, Plaintiffs specifically allege that DeKalb County voters

use the Peer Support, Wellness, and Respite Center as their "home base" and use it to "receive mail, conduct meetings, receive and apply for various services… engage in myriad activities, stay overnight, and return frequently… during the day," making *Pitts* particularly on point. *Compare id.*, *with* Dkt. 1 ¶¶ 58, 87, 89.

By contrast, Defendants' position – that voters who lack a permanent fixed address may not register to vote in DeKalb County – violates the maxim that, while states may enact reasonable registration requirements, they may not deny classes of residents the right to vote. *Carrington v. Rash*, 380 U.S. 89, 96 (1965) (finding "States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State"). Curiously, the cases cited by Defendants undermine and do not support their position in this regard. *See, e.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 342 (1972) (holding that "durational residence laws must be measured by a strict equal protection test"); *Kramer v. Union Free School Dist. No. 35*, 395 U.S. 621, 622-23 (1969) (statute restricting right to vote in school district elections to voters who own or lease property in the district or have a child enrolled in school violates the Equal Protection Clause).

## V. PLAINTIFFS SEEK VALID AND ENFORCEABLE INJUNCTIVE <u>RELIEF IN THIS CASE</u>

Defendants' argument that Plaintiffs seek two unenforceable "obey-the-law" injunctions, *see* Dkt. 1 at 21, ignores the court's reasoning in the only case on

which they rely. The Eleventh Circuit has held that injunctions "shall be specific in terms" and contain "reasonable detail" in order "to protect those who are enjoined by informing them of what they are called upon to do." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200 (11th Cir. 1999) (quoting *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996)). Injunctions must therefore "contain 'an operative command capable of enforcement.'" 178 F.3d at 1200-01 (quoting *Int'l Longshoremen's Ass'n. v. Marine Trade Ass'n*., 389 U.S. 64, 73–74 (1967)). The injunction sought by the plaintiffs in *Belle Glade* plainly failed that test; the plaintiffs requested "an injunction prohibiting the City from discriminating against the Okeechobee Center in future annexation decisions." 178 F.3d at 1201 (holding that "[a] court is incapable of enforcing so broad and vague an injunction").

By contrast, Plaintiffs' requests that the Court order Defendants to adopt new procedures for "removing voters from the rolls premised on an alleged change of address" and "processing and adjudicating challenges to voters' eligibility," *see* Dkt. 1 ¶¶ iv, viii (Prayer for Relief), do not suffer from this infirmity. These commands would remedy Defendants' failure to employ NVRA-compliant procedures, *see* Dkt. 1 ¶¶ 29-46, and provide notice to Defendants of what actions are required. *See Hughey*, 78 F.3d at 1531 (complaint must give parties "fair and precisely drawn notice of what the injunction actually prohibits") (quotation

omitted). Moreover, these requests afford Defendants an opportunity to adopt NVRA-compliant procedures – relief that this court has the power to order itself. *See, e.g.*, *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341 (N.D. Ga. 2018) (proposing an injunction altering counties' procedures for processing absentee ballots).

Courts have ordered similar – and broader – relief to remedy NVRA violations in other cases. *See, e.g.*, *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1007 (W.D. Mo. 2018) (ordering defendants to "revert[] to the change of mailing address procedures in use before August 1, 2017" and to send a mailing, among other relief); *N.C. State Conf. of NAACP*, 2018 WL 3748172, at *13 (ordering election officials to "take all reasonable and necessary steps to ensure statewide compliance with the NVRA consistent with this Court's Memorandum Opinion and this Order"); *see also Hancock Cty. Bd. of Elections and Registration*, No. 5:15-cv-414-CAR, Dkt. 67-1 (consent order requires officials to adhere to challenge adjudication and list maintenance procedures and places the BOE under court jurisdiction). As in those cases, the remedy requested here is tailored to the injuries alleged by Plaintiffs. *See* Dkt. 1 ¶¶ 64-77.

Finally, Plaintiffs' request for record maintenance is necessary to ensure Defendants' compliance with the NVRA. This request is particularly necessary in light of Defendants' failure to provide all of the documents and records sought by

Plaintiffs in their record requests pursuant to the NVRA, 52 U.S.C. §§ 20507(i)(1)-(2), and the Georgia Open Records Act, O.C.G.A. § 50-18-71. *Compare* NVRA Notice Letter, Dkt. 1-11 at 6, with DeKalb County Response, Dkt. 1-12. Preserving the records – including records arguably beyond the scope of O.C.G.A. § 21-2-236 – that are requested in the Complaint, *see* Dkt. 1 ¶ v (Prayer for Relief) – is critical to remedying Plaintiffs' injuries in this case.

## VI. THE COMPLAINT STATES TWO CLAIMS UNDER § 1983

Defendants' argument that the Complaint fails to allege they "have executed a local government policy or custom resulting in a constitutional violation," *see* Dkt. 27 at 23, misses the mark for several reasons – most importantly because it is foreclosed by binding Eleventh Circuit precedent. *Barnett v. MacArthur*, --- F.3d ----, 2020 WL 1870445, at *5 (11th Cir. Apr. 15, 2020) (holding that local agencies may be held liable for enforcing an unconstitutional policy even if it is consistent with state law). Moreover, it is not clear exactly what Defendants want the Court to do. They ask the Court to "dismiss the § 1983 claim." *Id*. However, Plaintiffs have brought two § 1983 claims here – Counts IV and V. *See* Dkt. 1 ¶¶ 80-85. Compounding the confusion, Defendants refer twice in the relevant passage to Plaintiffs' NVRA claims, *see* Dkt. 27 at 23, but they are not brought under § 1983. *See* 52 U.S.C. § 20510(b) (affording a private right of action under the NVRA).

Defendants, correctly, do not appear to contest that it is their policy to immediately purge challenged voters from the rolls and to deny registration to those they deem as "us[ing] a temporary address to vote." *See* Dkt. 27 at 23. They suggest these policies are acceptable because they are required by state law. *See id*. However, state law does not "mandate[]" that the DeKalb County BRE immediately purge voters who are challenged based on allegations that they have moved. *See* O.C.G.A. §§ 21-2-228, 21-2-229; *see* Section I, *supra*. Not only are other Georgia counties employing different procedures from DeKalb County, but a court recently entered an order enjoining Hancock County officials from following similar procedures. *See Hancock Cty. Bd. of Elecs and Registration*, Dkt. 67-1 at 2-3. Of course, even if Defendants were correct that their procedures were mandated by state law, Plaintiffs have still alleged a § 1983 claim according to the Eleventh Circuit. *Barnett*, 2020 WL 1870445, at *5 (holding that "the statute could be unconstitutional as applied to Ms. Barnett through the Sheriff's hold policy"); *see also N.C. State Conf. of NAACP v. N.C. State Bd. of Elections*, 2016 WL 6581284 at *2 (M.D.N.C. Nov. 4, 2016) (rejecting argument that "state laws purportedly allow private individual challenges to voter registrations based on evidence that voters have moved out of the precinct")

Accepting the allegations contained in the Complaint as true, Plaintiffs have

alleged viable § 1983 claims. *Compare* Dkt. 27 at 22, *with Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005). Plaintiffs allege Defendants are "categorically classifying electors registered at 444 Sycamore Drive as ineligible to vote at that address" in violation of the U.S. Constitution, *see* Dkt. 1 ¶¶ 57-59, 87-91, and that Defendants employ "purge procedures" that "deny and severely burden DeKalb County citizens' fundamental right to vote," *see id.* ¶¶ 30-48, 80-85. Plaintiffs' Complaint is rife with allegations that DeKalb County's purge policies burden voters' rights. *See, e.g.*, Dkt. 1 ¶¶ 31-34, 37-38, 42-48, 50-55.

The question of whether Plaintiffs have stated a § 1983 claim does not turn on whether DeKalb County officials are attempting in good faith to comply with "the state law voter qualification challenge procedure." *Compare* Dkt. 27 at 23, *with Barnett*, 2020 WL 1870445, at *5; *see also Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1286-88 (2019) (holding Plaintiffs stated viable § 1983 claims challenging "removing and preventing voter registrations under the "Use it or Lose it" statute and "Exact Match" policy and failing to adequately equip polling places). Election officials' actions burdening the right to vote give rise to a viable § 1983 claim, whether they result from misapplications of state law or something else. *See id*. at 1288; *see also League of Women Voters of*

*Ohio v. Brunner*, 548 F.3d 463, 466 (6th Cir. 2008) (allegations of inadequate training of poll workers sufficient to state a right-to-vote claim).

Plaintiffs' Complaint properly pleads that Defendants' procedures violate the fundamental right to vote, which is protected by the U.S. Constitution. Nothing more is required at this stage. *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 708 (11th Cir. 2014).

## **CONCLUSION**

Defendants' Motion to Dismiss should be denied, for the reasons articulated above. In the event the Court grants any part of the Motion, Plaintiffs request leave to modify the Complaint accordingly.

This 11th day of May, 2020.

Respectfully submitted,

*/s/ Gail Podolsky*
Gail Podolsky
Georgia Bar No. 142021
Carlton Fields, P.A.
1201 West Peachtree Street, Suite 3000
Atlanta, Georgia 30309-3455
Telephone: (404) 815-3400
Email: gpodolsky@carltonfields.com

Sean J. Young
Georgia Bar No. 790399
ACLU of Georgia
1100 Spring Street, N.W.
Atlanta, Georgia 30309
Telephone: (770) 303-8111
Email: syoung@acluga.org

Ezra Rosenberg
The Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8300
Email: erosenberg@lawyerscommittee.org

Bradley Phillips
The Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8300
Email: bphillips@lawyerscommitte.org

Julie Houk
The Lawyers' Committee for Civil Rights Under Law

1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8391
Email: jhouk@lawyerscommittee.org

*/s/ John Powers*
John Powers*
The Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8389
Email: jpowers@lawyerscommittee.org

Sophia Lin Lakin*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Email: slakin@aclu.org

Dale E. Ho*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Email: dho@aclu.org

*Admitted pro hac vice

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE AND CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system (which document was prepared in Times New Roman font, 14-point type, one of the font and point selections approved by the Court in N.D. Ga. L.R. 5.1(C)), which will automatically send e-mail notification of such filing to all counsel of record.

*/s/ John Powers*
John Powers*
The Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8389
Email: jpowers@lawyerscommittee.org